IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR NO. 07-00268-01 JMS |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART DEFENDANT |
| vs. | ) | NELSON GAITAN-AYALA'S |
| | ) | MOTION FOR A NEW TRIAL |
| NELSON GAITAN-AYALA, (01) | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT NELSON GAITAN-AYALA'S MOTION FOR A NEW TRIAL

## I. INTRODUCTION

On October 7, 2008, a jury trial commenced against Defendant Nelson

Gaitan-Ayala ("Defendant") on five counts of the First Superceding Indictment

("FSI") including: (1) conspiring to possess with intent to distribute and to

distribute 500 grams or more of a substance containing a detectable amount of

methamphetamine in violation of 21 U.S.C. § 846 (Count 1); (2) distributing 50

grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and

(b)(1)(A) on November 16, 2006 (Count 6); (3) distributing 50 grams or more of

methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) on March

23, 2007 (Count 7); (4) using a communication facility in causing and facilitating

the commission of a conspiracy to possess with intent to distribute and to distribute

methamphetamine in violation of 21 U.S.C. § 843(b) on December 13, 2006

(Count 11); and (5) using a communication facility in causing and facilitating the

commission of a conspiracy to possess with intent to distribute and to distribute

methamphetamine in violation of 21 U.S.C. § 843(b) on December 17, 2006

(Count 12).

In support of these Counts, the government called Corey Kaowili

("Kaowili"), who testified, among other things, that he purchased six pounds of

methamphetamine from Defendant on November 17, 2006, and arranged to have

an undercover police officer purchase one pound of methamphetamine from

Defendant on March 23, 2007.  Kaowili also explained numerous tape recordings

of conversations between himself and Defendant and other co-conspirators which

purportedly establish Defendant's involvement in these transactions.  During the

time of these transactions, Kaowili was cooperating with the government and

testified that he had given up dealing drugs as a way of giving back to the

community.

On October 17, 2008, the jury found Defendant guilty on the five

Counts of the FSI.  Assistant U.S. Attorney Susan Cushman ("AUSA Cushman")

later filed three "Notices of Newly Discovered Giglio Material" which disclosed

that after the trial she learned of evidence that while cooperating with the

2

government in 2007, Kaowili purchased several kilograms of cocaine and five

pounds of methamphetamine, and in 2002, the Drug Enforcement Administration

("DEA") recovered $19,680 from Kaowili at the Honolulu International Airport.

Doc. Nos. 583, 599, 608.  Consequently, Defendant filed his Motion for a New

Trial due to this late-disclosed evidence.  Based on the following, the court finds

that the government's failure to disclose this information warrants a new trial on

some of the Counts of the FSI and therefore GRANTS IN PART and DENIES in

PART Defendant's Motion for a New Trial.

## II. <u>BACKGROUND</u>

### A.    **The Trial**

Trial commenced on October 7, 2008 and after five days of testimony,

the jury returned a verdict against Defendant on all Counts of the FSI on October

17, 2008.  The evidence presented is summarized as follows:

#### 1.    *The Government's Evidence*

During trial, the government presented testimony and evidence to

support their contention that Defendant was involved in the transport and sale of

methamphetamine on Oahu between 2005 and 2007.

For example, Edward Tufele ("Tufele") testified that he met with

Defendant in 2005 so that Tufele could assist in the transport of methamphetamine

3

from Las Vegas to Hawaii by canning the methamphetamine in metal cans.  Doc.

No. 588, Trial Tr. 2-17-24.  Tufele testified that he subsequently canned

methamphetamine on two separate occasions and placed the canning machine in

storage in Las Vegas before his December 2005 arrest.  *Id.* at 2-124-31; *see also*

Pl.'s Exs. 2 (rental agreement for storage unit), 21 (flight information for Tufele).

Nathan Oandasan ("Oandasan"), Zaneta Nixon ("Nixon"), and Regina

Costales ("Costales") provided further details of the operation on Oahu.  Oandasan

testified that he received methamphetamine from Las Vegas, dropped it off to

dealers in Hawaii, collected the money, and sent the money to Las Vegas.  *See*

Doc. No. 588, Trial Tr. 2-187-88.  Oandasan further testified that he reported to

John Ayala and Hector Cruz ("Cruz"), and was told that Defendant was the "boss."

*Id.* at 2-191.  Oandasan and Nixon both testified about receiving methamphetamine

through the mail which was packaged in metal cans, *id.* at

2-187-88; Doc. No. 589, Trial Tr. 3-147; and Oandasan, Nixon, and Costales all

testified regarding their travels to Las Vegas to transport proceeds from the drug

sales to Defendant in Las Vegas.  They explained that Defendant personally met

each of them at the airport and collected the money.  Doc. No. 588, Trial Tr.

2-194 -200; Doc. No. 589, Trial Tr. 3-63-69, 3-151-52; Pl.'s Exs. 23 (flight

information for Oandasan, Costales and Nixon), 25 (hotel information Oandasan,

4

Costales and Nixon).

The government also presented testimony that Defendant (1) checked on the status of the Oahu portion of the drug operation by calling Oandasan and Costales, Doc. No. 588, Trial Tr. 2-192; Doc. No. 589, Trial Tr. 3-82; (2) came to Oahu in September 2006 for less than 24 hours purportedly to collect money from Oandasan, Doc. No. 588, Trial Tr. 2-201-02; Pl.'s Ex. 23 at 81, 83 (flight information for Defendant); (3) was aware he was under surveillance, Doc. No. 589, Trial Tr. 3-162-63; Doc. No. 590, Trial Tr. 4-55; Pl.'s Ex. 61; and (4) spoke to a paid informant, who testified that Defendant was interested in a possible deal to transport drugs to Atlanta. Doc. No. 589, Trial Tr. 3-206-09. Nixon further testified that she visited Defendant in Las Vegas in November 2006 and told him that she was short on paying for the methamphetamine she had already received. Defendant assured her that she would still receive methamphetamine to sell, and Nixon received additional methamphetamine shortly thereafter. Doc. No. 589, Trial Tr. 3-151-52.

Testimony and evidence was also admitted regarding methamphetamine deals in November 2006 and March 2007. Kaowili testified that he spoke with John Ayala and Raychel Cabral ("Cabral") in 2006 about a transaction in which he would pay Defendant for six pounds of methamphetamine.

Doc. No. 590, Trial Tr. 4-64. Kaowili gave a tracking number for a package to

Federal Bureau of Investigations ("FBI") Special Agent Gary Byrd ("Special

Agent Byrd"), who intercepted a package containing two sealed cans with

methamphetamine on November 17, 2006. Doc. No. 590, Trial Tr. 4-19; Pl.'s Exs.

26-31, 35A. On November 19, 2006, Defendant arrived on Oahu (again, for less

than 24 hours), *see* Pl.'s Ex. 23 at 88; and Kaowili testified that Defendant told him

to pay Cabral for the methamphetamine. Doc. No. 590, Trial Tr. 4-65-66.

Subsequently, the FBI provided money to Kaowili to pay Defendant through Ayala

and Cabral on December 7, 2006, December 17, 2006, and December 21, 2006,

Doc. No. 590, Trial Tr. 4-23-28; Pl.'s Exs. 36-38, and mailed money on January

26, 2007. Doc. No. 588, Trial Tr. 2-58-59; Pl.'s Ex. 39.

The government further presented telephone recordings intercepted by

the FBI between John Ayala and Cabral and Defendant around the dates of some of

these payments which purportedly discuss Kaowili paying for the

methamphetamine. On December 13, 2006, John Ayala told Defendant that he

spoke with the "pretty one," who Defendant clarified was the "long hair one."

Pl.'s Ex. 57A. John Ayala explained that this individual was going to "put

something together for this weekend" and had previously tried to reach Defendant

because he had "something" for Defendant. *Id*. At this time, Kaowili had long

hair at least to his mid-back.  Doc. No. 588, Trial Tr. 2-57-58.

On December 17, 2006, the same day the FBI gave Kaowili $10,000 to pay Cabral, Cabral called John Ayala and informed him that "he only gave me ten" and that she "gotta wait I guess Friday."  Pl.'s Ex. 58.  In a later conversation that same day between Defendant and John Ayala, Defendant told John Ayala to call "the long haired guy" and ask what is going on because "the people have already bought the stuff."  Pl.'s Ex. 59A.  Defendant further told John Ayala:

> Call him now.  Ask him: What's up?  Because it's been now, now, now . . . it's a lot of bull shit man.  He's done it to me before . . . last time, you remember all the mess I made with all the people.  They were waiting and spending a lot.  This is no game for us to go back forth.  You went over there and now back again.  You understand me?  Hey, be firm . . . I'm just getting on my way over there right now, but call him right now.

Pl.'s Ex. 59A.

Beyond this evidence, Kaowili explained several taped conversations he had with Defendant, Cabral, and John Ayala in which the parties never directly used the words "drugs," "methamphetamine, or "ice," and at times instead talked about "derbies," "roosters" and "cars."  *See, e.g.*, Pl.'s Exs. 62-66.  For example, Kaowili explained that the following November 7, 2006 conversation with John Ayala was regarding sending methamphetamine to Oahu:

> Kaowili:      . . . Remember, I told you, my friend going take
>                   care da . . . we just, we just do 'em the old way.  I

> going give you the address.  You send me up 2 or
> 3.  And then I going da kine send you back the
> money with my money.  You know what I mean?
>
> John Ayala: Okay.  Yeah.

Pl.'s Ex. 63; *see also* Doc. No. 590, Trial Tr. 4-90.

Kaowili also explained that the following March 19, 2007

conversation with Defendant discussing a debt on an "old car" was really about his

payment for the six pounds of methamphetamine:

| | |
|---|---|
| Kaowili: | He said about the, the, the, old, the old, the old, you know that old bill I owe. |
| Defendant: | Yeah I know on the old car we have, used to have, yeah. |
| Kaowili: | Yeah, umm, I only owe '8' on that, but he was telling me for let you know, that you know something. |
| Defendant: | Um-hum. |
| Kaowili: | I was sending the money, and da kine came up and got the money. |
| Defendant: | Oh good, OK, how much, how much . . . |
| Kaowili: | I owe $8,000 more on it. |
| Defendant: | And how much you give to him? |
| Kaowili: | I gave them, the last one, remember, remember we, we agreed just pay for what the thing was, for the six of them? |
| Defendant: | Oh yeah . . . . |

Pl.'s Ex. 70; *see also* Pl.'s Ex. 65.

Regarding the March 2007 transaction, Kaowili introduced an

undercover Honolulu police officer, Officer Keane Tabanera ("Tabanera"), to Cruz

to purchase one pound of methamphetamine.  Tabanera testified that he met Cruz

8

on March 14, 2007, but because the "chickens" (as Cruz referred to it), had not

arrived yet, they had to meet again on another day.  Doc. No. 590, Trial Tr.

4-148-49.

Kaowili then had a series of conversations with Cruz and Defendant

during the evening hours of March 19, 2007.  In the first conversation, Cruz tells

Kaowili to speak with "Uncle," Defendant's nickname:

> Cruz:  (unintelligible) . . . alright-alright, here we go, OK, you know what, um, I would like you talk to uncle you know that way (unintelligible) we clear, make it clear, that shit, you know what I mean?  And then um, especially, explain him everything, you know, explain him what's up and everything, you know, that's all I want and after-after-after he pau[1] talk to you, he going to call me back, then I call you back, oh (unintelligebly) to you, OK?
> Kaowili:  OK.

Ex. 69.

That same day, Kaowili then had the following conversation with

Defendant:

> Defendant:  . . . . so do you want to still fight roosters?
> Kaowili:  Yeah, yeah.  (unintelligible) I told them the plan, and I told him you know now now, I spoke to you

---

[1]  In Hawaiian, "pau" means "[f]inished, ended, through, terminated, completed, over, all done; final, finishing; entirely, completely, very much; after; all, to have all; to be completely possessed, consumed, destroyed."  Mary Kawena Pukui & Samual H. Elbert, Hawaiian Dictionary (Univ. of Haw. Press 1986).

                    cousin[2] down here about how we going to fight chicken and he kinda agrees with it, I going to purchase one, I going to introduce, introduce him to my cousin, and from there, we going to work things out from there, instead of me, you know, you know what I mean?

Defendant:  Yeah?

. . .

Kaowili:  I got to build, because I, I, I like be, I going to be involved, but I going to be out of sight, I going to overlook the situation, you know what I mean?

Defendant:  Um hum.

. . .

Defendant:  Go, go and talk, yeah go and talk to him, and you guys define the plan how you going to fight the chickens, and then he's going to let me know, you know, and um, I, I'm here, I take care of them here, I doing my part here, you know like now we going to be straight um, you know any problem understand, you call me this phone, right now here, that you have right now, call me up, it's going to be um, only in like night time.

Kaowili:  Oh, night time, this number?

Defendant:  Yeah, like night time I either call you, you know, after, after six seven from here you can call me, because I want to keep it off in the daytime, and you know.

Kaowili:  OK, OK, I talk to him, I don't know (unintelligible) um are we still fighting the um chickens on Wednesday, or the derby got delayed?

Defendant:  Wednesday is (unintelligible) yeah, yeah, should be (unintelligible) or like, I believe it going to be Wednesday.  Talk to him tomorrow, you guys can talk to that cousin, and I can, I going to go talk to him, and then from, from that you guys can just,

---

    2  Cruz is related to Defendant by marriage.  Doc. No. 591, Trial Tr. 5-116.

you know, decide what you guys going to do there.

Pl.'s Ex. 70.

After Kaowili spoke with Defendant, on that same day, Cruz called

Kaowili and left the following message:

> Cruz:    Hey bro, I think that everything is-is alright now, I
>          mean um, I mean you talked to him already so it's
>          going to be cool, so um, I give you a call
>          Wednesday to see what's up, OK?  Let see if we
>          go buy some chickens or something. . . .

Ex. 71.

On Wednesday, March 21, 2007, Kaowili and Cruz met, but no

transaction occurred due to "trouble" in Mexico:

> Cruz:       Um.  We being here lately, we have a little trouble
>             because you know, that they fucked up in Mexico.
>             You know, the government.
> Kaowili:    Uh.
> Cruz:       (unintelligible) like I said.  But uh, the deal right
>             now is that the thing is on the way now.
> Kaowili:    No kidding.  Okay.
> Cruz:       It's on the . . . it's on the way of for you now.
>             Okay so, I just going call you.  Uncle told me, he
>             will talk . . . calling you . . .

Pl.'s Ex. 72.

Cruz then arranged for a meeting on Friday, March 23, 2007 at the

Zippy's restaurant in Wahiawa, Oahu:

> Kaowili:    So where we going fight, though?  When we going

|          | fight with Larry?                                    |
|----------|------------------------------------------------------|
| Cruz:    | Saturday.  Uh Friday.  Friday for sure.             |
| Kaowili: | For sure.                                            |
| Cruz:    | But the other hundred percent, for sure Friday.     |
| Kaowili: | No meet someplace else or you know too much time.   |
| Cruz:    | Okay.  Okay, I know.  So what we gonna do.           |
| Kaowili: | So I going call you, and I . . .                     |
| Cruz:    | Let's meet at Zippy's Wahiawa.                        |

*Id.*

On Friday, March 23, 2007, Tabanera met Cruz at the Zippy's restaurant in Wahiawa and received one pound of methamphetamine in exchange for $25,000.  Doc. No. 590, Trial Tr. 4-151-54; Pl.'s Exs. 43, 44A, 74.  On this same day, Nixon received a pound of methamphetamine from Cruz, who told her that "Uncle" told him to sell the other pound to Kaowili.  Doc. No. 589, Trial Tr. 3-156-57.

On June 7, 2007, a search warrant was executed on Defendant's residence in Las Vegas, where agents recovered $25,000 from Defendant's bedroom closet, $10,000 in a cowboy boot, $2,000 from a bedroom drawer, and a .357 magnum pistol from the nightstand table.  Doc. No. 589, Trial Tr. 3-189-91; Doc. No. 591, Trial Tr. 5-48-49; Pl.'s Exs. 46-53.

///

///

12

## 2.    *Defendant's Evidence*

On cross examination, Defendant impeached each of Plaintiff's cooperating witnesses to some degree.  For Oandasan, Nixon, and Costales, Defendant raised that they are all long-time drug users, are seeking lower sentences by assisting the government, and did not disclose Defendant's alleged involvement in their drug dealings during their initial interviews with the government.  On cross examination, Kaowili testified that he started taking drugs in the sixth grade, stole to support his habit, and then began selling drugs in intermediate school.  Doc. No. 590, Trial Tr. 4-114-15.  Kaowili openly admitted that by 2001, he was selling two to three pounds of methamphetamine a week.  *Id.* at 4-115-16.  Kaowili explained, however, that he stopped selling drugs once he began cooperating with the government:

> Q.    And when you agreed to cooperate with the government, basically you were trying to save yourself; right?
> A.    I mean I just was doing what I felt was the right thing to do.
> Q.    And the right thing was to save yourself from going to prison for life; right?
> A.    Save everybody else, giving back to the community and the younger kids, less dope to the island.
> . . .
> Q.    How were you going to give back to the community?
> A.    My way of giving back and to the kids, I mean the younger generation: one less main supply of bringing dope to the islands.

*Id.* at 4-117.  As a result of his cooperation, Kaowili received a greatly reduced sentence of 46 months, well below the ten-year mandatory minimum.  *Id.* at 4-110.  The government also had the option of filing a further motion for downward departure.  *Id.* at 4-111-13.

Defendant also called several witnesses.  Erika Gaitan, Defendant's daughter, testified that Defendant ran a legitimate car repair business, was actively involved in rooster fighting, and was not, to her knowledge, involved in drugs in any way.  *See generally* Doc. No. 491, Trial Tr. 5-78-86.  She further explained that the gun found in the house was her mother's and that Defendant kept cash in the house for his car business and to gamble.  *Id.* at 5-80-81.  John Ayala, who pled guilty to drug charges, testified that his uncle, Defendant, was not involved in any of John Ayala's drug activities and that Defendant had loaned money to Kaowili, who had difficulty repaying Defendant.  *Id.* at 5-99-101.

## B.    The Government's Post-Trial Giglio Disclosures

On December 19, 2008, the government filed its "Notice of Newly Discovered Giglio Material," which disclosed a statement made prior to Defendant's trial by Holokai Mateialona ("Mateialona") that he sold several kilograms of cocaine to Kaowili while he was cooperating with the government in 2007.  Doc. No. 583.  On February 2, 2009, the government filed its "Supplemental

14

Notice of Newly Discovered Giglio Material," which disclosed another statement

made prior to Defendant's trial by Mateialona that he delivered five pounds of

methamphetamine to Kaowili in March 2007.  Doc. No. 599.  Finally, on March

17, 2009, the government filed its "Second Supplemental Notice of Newly

Discovered Giglio Material," which disclosed that DEA Special Agent Richard

Jones recovered $19,680.00 from Kaowili at the Honolulu International Airport on

August 15, 2002.  Doc. No. 608.

During a March 19, 2009 hearing, AUSA Cushman provided a

proffer, explaining that the Mateialona material was not intentionally withheld, but

was not disclosed due to errors in cross-referencing files.  The parties agree that

there is no evidence of any intentional withholding of any of the *Giglio* materials,

but that the government did act negligently.

## III.  <u>STANDARD OF REVIEW</u>

"[S]uppression by the prosecution of evidence favorable to an accused

upon request violates due process where the evidence is material either to guilt or

to punishment."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  "*Brady* encompasses

impeachment evidence as well as exculpatory evidence."  *United States v.*

*Antonakeas*, 255 F.3d 714, 725 (9th Cir. 2001); *see also Giglio v. United States*,

405 U.S. 150 (1952).  In order to prevail on a *Brady* claim, a defendant *United*

*States v. Jernigan*, 492 F.3d 1050, 1053 (9th Cir. 2007) (en banc); *see also*

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Banks v. Dretke*, 540 U.S. 668,

691 (2004); *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).

Evidence is material "if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have

been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see United*

*States v. Ross*, 372 F.3d 1097, 1107 (9th Cir. 2004) ("Evidence is material and

favorable if there is a reasonable probability that the disclosure of the evidence

would have changed the trial's result.").  "A defendant need not show that she

would more likely than not have received a different verdict with the evidence."

*Jernigan*, 492 F.3d at 1054 (internal quotation marks omitted).  Rather, a defendant

"need only show 'that the favorable evidence could reasonably be taken to put the

whole case in such a different light as to undermine confidence in the verdict.'"  *Id*.

at 1054 n.7 (quoting *Kyles*, 514 U.S. at 435).

The court must analyze the withheld evidence in context of the entire

record and "undertake a careful, balanced evaluation of the nature and strength of

both the evidence the defense was prevented from presenting and the evidence

each side presented at trial."  *Id*. at 1054 (internal quotation marks omitted).

# IV. **DISCUSSION**

The parties do not dispute that the evidence at issue -- that Kaowili purchased several pounds of methamphetamine and cocaine in 2007 and was stopped at the Honolulu International Airport in 2002 with $19,680 -- was not disclosed until after the jury verdict.  Further, this evidence is clearly favorable to Defendant as impeachment evidence of Kaowili.  Accordingly, the relevant issue is whether this evidence is material, *i.e.*, whether this evidence puts the case in such a different light as to undermine confidence in the verdict.  The government argues that this evidence is cumulative of the other impeachment evidence available to Defendant such that a new trial is not warranted.  In comparison, Defendant argues that this late-disclosed evidence requires a new trial on all counts of the FSI because it directly contradicts Kaowili's testimony as a completely reformed drug dealer and Kaowili was the only witness to affirmatively link Defendant to the five Counts of the FSI.  Def.'s Mot. 7.

The court first addresses whether the impeachment evidence is cumulative, and, finding that it would have significantly impeached Kaowili, analyzes the significance of his testimony to the government's case.

///

///

## A.     Whether the Impeachment Evidence Is Cumulative

In general, impeachment evidence is cumulative and not material where it "merely duplicate[s] grounds for impeaching [the witness] that were actually presented to the jury." *Barker v. Fleming*, 423 F.3d 1085, 1096 (9th Cir. 2005).  The court must view the withheld evidence in the context of the entire record.  *See Kyles*, 514 U.S. at 460.

On cross examination, Defendant impeached Kaowili by raising, among other things, that Kaowili was hoping to reduce his sentence by cooperating with the government and sold two to three pounds of methamphetamine a week for years.  Evidence that the government seized approximately $20,000 in 2002 is merely additional evidence of Kaowili's admitted drug dealing during this same time period and therefore does not provide "the defense with a new and different ground of impeachment." *Silva v. Brown*, 416 F.3d 980, 989 (9th Cir. 2005).

Evidence that Kaowili continued to receive large amounts of drugs *after* he started cooperating with the government, however, is very different than the impeachment evidence presented at trial.  On the stand, Kaowili portrayed himself as a completely reformed drug dealer -- he testified that once he began cooperating with the government he stopped selling drugs as a way to give back to the community and the "kids."  Indeed, by openly admitting to his extensive

18

involvement in the Hawaii methamphetamine trade, Kaowili actually bolstered that he was now telling the truth.  Evidence that Kaowili continued to deal drugs would have provided powerful and unique evidence that Kaowili was not only fabricating his status as a reformed drug dealer, but that he deceived the government.  Thus, this evidence would certainly have damaged Kaowili's credibility in a way that the impeachment evidence known to Defendant did and could not.  *See Benn*, 283 F.3d at 1055 ("The mere fact that a prosecution witness has a prior record, even when combined with other impeachment evidence that a defendant introduces, does not render otherwise critical impeachment evidence cumulative."); *United States v. Brumel-Alvarez*, 976 F.2d 1235 (9th Cir. 1992), *amended and superseded on other grounds by*, 991 F.2d 1452, 1463 (9th Cir. 1993) (finding a *Brady* violation where the government withheld evidence that an informant made false claims to the government because the "[e]vidence that he lied during the investigation . . . would be relevant to his credibility and the jury was entitled to know of it").

Accordingly, the court concludes that the withheld evidence regarding Kaowili's purchase of cocaine and methamphetamine would have created additional doubt as to Kaowili's credibility.

**B.      Significance of Kaowili's Testimony to Each Count**

Because the withheld impeachment evidence would have created

additional doubt as to Kaowili's credibility, the court must analyze the significance

of his testimony to the government's case.  *Benn*, 283 F.3d at 1059.

In general, Kaowili was a significant witness for the government -- Kaowili was

involved in the November 17, 2006 and March 23, 2007 drug deals and interpreted

telephone conversations which purportedly link Defendant to these transactions

and the drug business in general.  Further, the other cooperating witnesses, Tufele,

Oandasan, Costales, and Nixon, were all impeached to some degree.  The court

therefore performs a careful analysis of each Count of the FSI to determine

whether the withheld evidence is material.

### 1.      *Counts 6, 11, and 12*

The court finds that Kaowili's testimony was significant for Counts 6,

11, and 12 of the FSI such that the withheld impeachment evidence puts these

Counts in such a different light as to undermine the court's confidence in the jury's

verdict.

Regarding Count 6, distribution of 50 grams or more of

methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) on

November 17, 2006, Kaowili testified that: (1) he spoke with John Ayala and

Cabral about a transaction in which he would pay Defendant for six pounds of

methamphetamine, Doc. No. 590, Trial Tr. 4-64; (2) after the six pounds arrived on

November 17, 2006, Defendant came to Kaowili's house and told him to pay

Cabral, *id.* at 4-65-66; and (3) he and Defendant and John Ayala discussed this

transaction and Kaowili's resulting debt in coded conversations that were recorded

by the FBI. *See, e.g.*, *id.* at 4-89-94.  The remaining evidence establishes that

(1) the FBI received from Kaowili the tracking number for a package from Las

Vegas and found that it contained two sealed cans holding methamphetamine, *id.* at

4-19; Pl.'s Exs. 26-31, 35A; (2) the FBI provided money to Kaowili to pay for the

six pounds of methamphetamine, Doc. No. 590, Trial Tr. 4-23-28; Pl.'s Exs. 36-38;

(3) Defendant traveled to Hawaii on November 19, 2006, Pl.'s Ex. 23 at 88; and

(4) Kaowili and Defendant had telephone conversations after Kaowili received the

methamphetamine.  Pl.'s Exs. 64, 65, 70.

Looking at the entirety of the evidence, it appears that Kaowili's

testimony was critical in bringing together all of the evidence to implicate

Defendant in this transaction.  Without Kaowili's testimony, there is no evidence

that directly and/or contemporaneously links Defendant to the November 17, 2006

transaction.  Setting aside Kaowili's testimony, the closest evidence tying

Defendant to this transaction is the phone conversations after the fact, but they

were not contemporaneous with the alleged drug deal and were ambiguous without

anyone to explain their meaning.[3]   At most, these tape recordings establish that

Kaowili owed Defendant money, and indeed, John Ayala testified that Defendant

had loaned Kaowili money.   Doc. No. 590, Trial Tr. 5-99-101.   While it is true that

the tape recordings and Defendant's quick trip to Oahu are suspicious, the court

cannot say with any confidence that had Kaowili been impeached with

---

[3]   For example, Kaowili testified that in the following conversation, Defendant told
Kaowili to pay Cabral for the six pounds of methamphetamine and that he was willing to ship
more drugs once payment is completed:

| | |
|---|---|
| Kaowili: | Ah, what, what, I give the, I give the tickets to da kine's girl?  Raychel? |
| Defendant: | Yeah, yeah, yeah.  You know, when, when you ready, you let me know. . . . |

Pl.'s Ex. 64; Doc. No. 590, Trial Tr. 4-91-92.
       Kaowili further testified that a March 19, 2007 conversation with Defendant regarding a
debt on an "old car" was really about his payment for the six pounds:

| | |
|---|---|
| Kaowili: | He said about the, the, the, old, the old, the old, you know that old bill I owe. |
| Defendant: | Yeah I know on the old car we have, used to have, yeah. |
| Kaowili: | Yeah, umm, I only owe '8' on that, but he was telling me for let you know, that you know something. |
| Defendant: | Um-hum. |
| Kaowili: | I was sending the money, and da kine came up and got the money. |
| Defendant: | Oh good, OK, how much, how much . . . |
| Kaowili: | I owe $8,000 more on it. |
| Defendant: | And how much you give to him? |
| Kaowili: | I gave them, the last one, remember, remember we, we agreed just pay for what the thing was, for the six of them? |
| Defendant: | Oh yeah . . . . |

Pl.'s Ex. 70; *see also* Pl.'s Ex. 65.

the withheld evidence, a jury still would have concluded from this evidence that Defendant was involved with the sale of six pounds of methamphetamine.

The court also finds that Kaowili's testimony was integral to Counts 11 and 12, using a communication facility in the commission of a conspiracy to possess with intent to distribute and to distribute methamphetamine on or about December 13, 2006 and December 17, 2006, respectively.  The government put forth evidence that at the time of these calls Kaowili was paying money to Cruz and Cabral for the six pounds of methamphetamine that the FBI received on November 17, 2006.  *Id.* at 4-23-28; Pl.'s Exs. 36-38.  In a phone call intercepted by the FBI on December 13, 2006, John Ayala told Defendant that he spoke with the "pretty one," purportedly Kaowili, Doc. No. 588, Trial Tr. 2-57-58, and that this individual was going to "put something together for this weekend" and had previously tried to reach Defendant because he had "something" for Defendant.  Pl.'s Ex. 57A.

On December 17, 2006, Special Agent Byrd gave Kaowili $10,000 to pay to Cabral.  Pl.'s Ex. 37; Doc. No. 590, Trial Tr. 4-24.  Cabral called John Ayala and informed him that "he only gave me ten" and that she "gotta wait I guess Friday."  Pl.'s Ex. 58.  In a later conversation between Defendant and John Ayala that same day, Defendant told John Ayala to call "the long haired guy" and

23

ask what is going on because "the people have already bought the stuff."  Pl.'s Ex.

59A.  Defendant further told John Ayala:

> Call him now.  Ask him: What's up?  Because it's been now,
> now, now . . . it's a lot of bull shit man.  He's done it to me
> before . . . last time, you remember all the mess I made with all
> the people.  They were waiting and spending a lot.  This is no
> game for us to go back forth.  You went over there and now
> back again.  You understand me?  Hey, be firm. . . I'm just
> getting on my way over there right now, but call him right now.

Pl.'s Ex. 59A.

While Kaowili did not specifically testify to the meaning of these

conversations, he provided the much-needed context that he had purchased six

pounds of methamphetamine on November 17, 2006, and was repaying Defendant

for these drugs during this time.  Without believing Kaowili's testimony linking

Defendant to the methamphetamine, a jury may believe that these conversations

were regarding the alleged legitimate debt that Kaowili owed Defendant.

In sum, the court finds that the withheld impeachment evidence is

material to Counts 6, 11, and 12 because it places them in such a different light that

it undermines the court's confidence in the verdict on these counts.  *See Banks v.*

*Dretke*, 540 U.S. 668, 701 (2004) (holding that suppressed evidence of a witness's

role as an informant was material where his testimony was the "centerpiece" of the

prosecution's case and noting that had the evidence been disclosed, the jury "might

well have distrusted [the informant's] testimony, and, insofar as it was

uncorroborated, disregarded it"); *see also Silva v. Woodford*, 279 F.3d 825, 854-55

(9th Cir. 2002) (holding that an evidentiary hearing was warranted on a *Brady*

claim involving a deal with a witness whose "credibility was a critical issue, given

that he was the only witness who could identify [defendant] as the trigger man").

Accordingly, the court GRANTS Defendant's Motion for a New Trial on Counts 6,

11, and 12 of the FSI.

     **2.**     ***Counts 1 and 7***

     Turning to the remaining counts of the FSI, its appears that Kaowili's

testimony played a much lesser role such that the withheld impeachment evidence

is not material to Counts 1 and 7.

     Count 7 charges Defendant with distribution of 50 grams or more of

methamphetamine on or about March 23, 2007.  After a careful review of the all of

the evidence, the court concludes that there is sufficient evidence to support

conviction on this Count such that the withheld impeachment evidence is not

material.

     To put this Count in context, the government presented significant

evidence that Defendant was heavily involved in the methamphetamine trade from

Las Vegas to Oahu.  For example, Oandasan, Nixon, and Costales all testified that

they each sold methamphetamine and/or collected drug proceeds for Defendant.

They each traveled to Las Vegas with these proceeds, where Defendant met them

and collected the money.  Doc. No. 588, Trial Tr. 2-194-200; Doc. No. 589, Trial

Tr. 3-63-69, 3-151-52.  Further, the government presented evidence that Defendant

arranged to have methamphetamine packaged in cans for shipment to Oahu, and

Nixon and Oandasan testified that they received, and FBI recovered,

methamphetamine packaged in this fashion.  Doc. No. 588, Trial. Tr. at 2-124-31,

2-187-88; Doc. No. 589, Trial Tr. 3-147; Pl.'s Exs. 26-31, 35A.

      Regarding the specific March 23, 2007 transaction, Tabanera testified

that Kaowili introduced him to Cruz as Kaowili's cousin so that Tabanera could

purchase one pound of methamphetamine.  Tabanera testified that he met Cruz on

March 14, 2007, but because the "chickens" (as Cruz referred to it), had not arrived

yet, they had to meet again on another day.  Doc. No. 590, Trial Tr. 4-148-49.

      Kaowili then had a series of conversations with Cruz and Defendant

during the evening hours of March 19, 2007.  In the first conversation, Cruz tells

Kaowili to speak with "Uncle," Defendant's nickname:

> Cruz:      (unintelligible) . . . alright-alright, here we go, OK,
> you know what, um, I would like you talk to uncle
> you know that way (unintelligible) we clear, make
> it clear, that shit, you know what I mean?  And
> then um, especially, explain him everything, you
> know, explain him what's up and everything, you

know, that's all I want and after-after-after he pau
talk to you, he going to call me back, then I call
you back, oh (unintelligibly) to you, OK?

Kaowili:     OK.

Ex. 69.

Kaowili then spoke with Defendant about his earlier conversation

with Cruz and introducing his "cousin" (Tabanera) to Cruz.  Defendant then

confirmed that they would "fight chickens" on Wednesday:

Defendant:  . . . . so do you want to still fight roosters?

Kaowili:     Yeah, yeah.  (unintelligible) I told them the plan,
and I told him you know now now, I spoke to you
cousin down here about how we going to fight
chicken and he kinda agrees with it, I going to
purchase one, I going to introduce, introduce him
to my cousin, and from there, we going to work
things out from there, instead of me, you know,
you know what I mean?

Defendant:  Yeah?

. . .

Kaowili:     I got to build, because I, I, I like be, I going to be
involved, but I going to be out of sight, I going to
overlook the situation, you know what I mean?

Defendant:  Um hum.

. . .

Defendant:  Go, go and talk, yeah go and talk to him, and you
guys define the plan how you going to fight the
chickens, and then he's going to let me know, you
know, and um, I, I'm here, I take care of them
here, I doing my part here, you know like now we
going to be straight um, you know any problem
understand, you call me this phone, right now here,
that you have right now, call me up, it's going to
be um, only in like night time.

27

| Kaowili: | Oh, night time, this number? |
|---|---|
| Defendant: | Yeah, like night time I either call you, you know, after, after six seven from here you can call me, because I want to keep it off in the daytime, and you know. |
| Kaowili: | OK, OK, I talk to him, I don't know (unintelligible) um are we still fighting the um chickens on Wednesday, or the derby got delayed? |
| Defendant: | Wednesday is (unintelligible) yeah, yeah, should be (unintelligible) or like, I believe it going to be Wednesday.  Talk to him tomorrow, you guys can talk to that cousin, and I can, I going to go talk to him, and then from, from that you guys can just, you know, decide what you guys going to do there. |

Pl.'s Ex. 70.

After Kaowili spoke with Defendant, later that evening, Cruz called

Kaowili and left the following message confirming that they would "buy some

chickens" on Wednesday:

| Cruz: | Hey bro, I think that everything is-is alright now, I mean um, I mean you talked to him already so it's going to be cool, so um, I give you a call Wednesday to see what's up, OK?  Let see if we go buy some chickens or something. . . . |
|---|---|

Pl.'s Ex. 71.

On Wednesday, March 21, 2007, Cruz and Kaowili met, just as

Defendant and Cruz had confirmed in their previous conversations with Kaowili.

Cruz, however, had to delay the "fight" due to "trouble" in Mexico and therefore

rescheduled for Friday at the Zippy's restaurant in Wahiawa, Oahu:

28

| Cruz: | Um.  We being here lately, we have a little trouble because you know, that they fucked up in Mexico.  You know, the government. |
| Kaowili: | Uh. |
| Cruz: | (unintelligible) like I said.  But uh, the deal right now is that the thing is on the way now. |
| Kaowili: | No kidding.  Okay. |
| Cruz: | It's on the . . . it's on the way of for you now.  Okay so, I just going call you.  Uncle told me, he will talk . . . calling you . . . |
| . . . | |
| Kaowili: | So where we going fight, though?  When we going fight with Larry? |
| Cruz: | Saturday.  Uh Friday.  Friday for sure. |
| Kaowili: | For sure. |
| Cruz: | But the other hundred percent, for sure Friday. |
| Kaowili: | No meet someplace else or you know too much time. |
| Cruz: | Okay.  Okay, I know.  So what we gonna do. |
| Kaowili: | So I going call you, and I . . . |
| Cruz: | Let's meet at Zippy's Wahiawa. |

Pl.'s Ex. 72.

Any doubt existing as to the meaning of these phone conversations -- that is, whether they relate to a drug deal or a chicken fight -- was lifted when Cruz met Tabanera on Friday, March 23, 2007 at the Zippy's Restaurant in Wahiawa to sell him one pound of methamphetamine.  Doc. No. 590, Trial Tr. 4-151-54; Pl's Exs. 43, 44A, 74.  That Cruz in fact sold methamphetamine (and not a chicken) provides clear context to the conversations leading up to the drug transaction, regardless of whether the jury accepted Kaowili's explanation of the conversations.

29

In other words, the conversations of March 19, 2007 led directly to the events of

March 23, 2007 and thus these conversations necessarily involved the sale of

methamphetamine.  Nixon further corroborates this conclusion by confirming that

the one pound of methamphetamine sold by Cruz on March 23, 2007 was obtained

from Defendant.  She was aware that Cruz had obtained two pounds of

methamphetamine for distribution, and wanted to obtain both pounds for her

further distribution, but was told by Cruz that "Uncle" told him to sell one pound

to Kaowili.  Doc. No. 589, Trial Tr. 3-156-57.

          This evidence connects Defendant to the March 23, 2007

methamphetamine transaction in a concrete and direct manner such that Kaowili's

testimony was unnecessary to the jury's verdict on this Count.  While Kaowili

explained the phone conversations between himself and Cruz and Defendant, given

the context of these conversations and all of the evidence presented, no explanation

by Kaowili was necessary to tie Defendant to this transaction.  Accordingly, given

the abundant evidence explained above, the withheld impeachment evidence is not

material -- that is, there is no reasonable probability that disclosure of the

impeachment evidence would have changed the jury's verdict as to Count 7.

          Finally, the court finds that the withheld impeachment evidence is not

material to Count 1 of the FSI, conspiracy to possess with intent to distribute and

to distribute methamphetamine.  Beyond the evidence regarding Defendant's

involvement with the March 23, 2007 transaction, the government presented

significant evidence separate from Kaowili's testimony regarding Defendant's

involvement in the drug business, including (1) Tufele's testimony that he canned

methamphetamine on two separate occasions in Las Vegas for Defendant, *id.* at

2-124-31; *see also* Pl.'s Exs. 2 (rental agreement for storage unit), 21 (flight

information for Tufele); (2) Oandasan's and Nixon's testimony that they received

methamphetamine through the mail which was packaged in metal cans, *id.* at

2-187-88; Doc. No. 589, Trial Tr. 3-147; (3) Oandasan's, Nixon's and Costales'

testimony that they each traveled to Las Vegas to transport money to Defendant

from the sale of the drugs, Doc. No. 588, Trial Tr. 2-194-200; Doc. No. 589, Trial

Tr. 3-63-69, 3-151-52; Pl.'s Exs. 23 (flight information for Oandasan, Costales and

Nixon), 25 (hotel information); (4) Oandasan's testimony that Defendant came to

Oahu in September 2006 for less than 24 hours to collect money, Doc. No. 588,

Trial Tr. 2-201-02; Pl.'s Ex. 23 at 81, 83 (flight information for Defendant);

(5) Nixon's testimony that Defendant assured her that he would make sure she still

received methamphetamine to sell after she was short on payment, Doc. No. 589,

Trial Tr. 3-151-52; and (6) evidence that Defendant was aware that he was under

surveillance.  Doc. No. 589, Trial Tr. 3-162-63; Doc. No. 590, Trial Tr. 4-55; Pl.'s

Ex. 61.

While Tufele, Oandasan, Nixon, and Costales were impeached to some degree, their testimony was corroborated with evidence and they presented a consistent story that Defendant was in charge of the Las Vegas operation of sending methamphetamine to Oahu.  Kaowili's testimony regarding the November 17, 2006 and March 23, 2007 transactions was not necessary for conviction on this Count of the FSI.

In sum, because the withheld impeachment evidence does not undermine the verdict on Count 1 and 7, the court DENIES Defendant's Motion for a New Trial on these Counts.

## V.  <u>CONCLUSION</u>

Based on the above, the court GRANTS in part and DENIES in part Defendant's Motion for a New Trial.  Defendant is granted a new trial on Counts 6, 11, and 12 of the First Superceding Indictment, and his conviction on Counts 1

///

///

///

///

and 7 still stand.  The court will schedule a status conference with the parties to

discuss the next steps in light of this Order.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, April 2, 2009.



    /s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*United States v. Gaitan-Ayala,* Cr. No. 07-00268-01 JMS, Order Denying Defendant Nelson
Gaitan-Ayala's Motion for a New Trial