IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR NO.  07-00268-01 JMS |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANT |
| | ) | NELSON GAITAN-AYALA'S |
| vs. | ) | MOTION FOR ENTRY OF |
| | ) | JUDGMENT OF ACQUITTAL, NEW |
| NELSON GAITAN-AYALA,   (01) | ) | TRIAL, OR OTHER APPROPRIATE |
| | ) | RELIEF |
| Defendant. | ) | |
| _____ | ) | |

## ORDER DENYING DEFENDANT NELSON GAITAN-AYALA'S MOTION FOR ENTRY OF JUDGMENT OF ACQUITTAL, NEW TRIAL, OR OTHER APPROPRIATE RELIEF

## I.  INTRODUCTION

On October 17, 2008, a jury found Defendant Nelson Gaitan-Ayala

("Defendant") guilty on the five counts of the First Superceding Indictment

("FSI"), including: (1) conspiring to possess with intent to distribute and to

distribute 500 grams or more of a substance containing a detectable amount of

methamphetamine in violation of 21 U.S.C. § 846 (Count 1); (2) distributing 50

grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and

(b)(1)(A) on November 16, 2006 (Count 6); (3) distributing 50 grams or more of

methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) on March

23, 2007 (Count 7); (4) using a communication facility in causing and facilitating

the commission of a conspiracy to possess with intent to distribute and to distribute methamphetamine in violation of 21 U.S.C. § 843(b) on December 13, 2006 (Count 11); and (5) using a communication facility in causing and facilitating the commission of a conspiracy to possess with intent to distribute and to distribute methamphetamine in violation of 21 U.S.C. § 843(b) on December 17, 2006 (Count 12).

On April 2, 2009, the court granted Defendant's separate Motion for a New Trial (Doc. No. 619) with respect to Counts 6, 11, and 12, and denied it with respect to Counts 1 and 7.  Currently before the court is Defendant's Motion for Entry of Judgment of Acquittal, New Trial, or other Appropriate Relief ("Defendant's Motion for Acquittal"), which, in light of the April 2, 2009 Order, the court interprets as directed to only Counts 1 and 7.  Defendant argues that he is entitled to an acquittal and/or new trial as to these Counts because (1) he was denied a public trial when his family was excluded from a portion of jury selection and evidence in the form of tape recordings was not published to the entire court room; (2) he was denied family visitation before and during the trial; (3) the government and the judge made repeated, groundless objections during Defendant's closing argument; and (4) none of the evidence directly implicates Defendant in any of the charges.

2

Based on the following, the court DENIES Defendant's Motion for Acquittal.

## II.  <u>STANDARDS OF REVIEW</u>

### A.     **Federal Rule of Criminal Procedure 29**

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[1]  The Ninth Circuit has recently explained the Rule 29 standard as follows:

> In considering a challenge to the sufficiency of the evidence, we review the entire record, "[v]iewing the evidence in the light most favorable to the government," and "must determine whether any rational jury could have found [the defendant] guilty of each element of the crime beyond a reasonable doubt." [*United States v. Esquivel-Ortega*, 484 F.3d 1221, 1224 (9th Cir. 2007).]  We do not "question [the] jury's assessment of witnesses' credibility, and must presume that the trier of fact resolved any conflicting inferences in favor of the prosecution." *United States v. Johnson*, 229 F.3d 891, 894 (9th Cir. 2000) (internal quotation marks and footnote omitted).

*United States v. Nevils*, 548 F.3d 802, 805 (9th Cir. 2008).

---

[1]  Only Defendant's fourth argument -- that none of the evidence directly implicates Defendant in any of the charges -- attacks the sufficiency of the evidence.  The court therefore applies the Rule 29 standard to this argument only, and the Rule 33 standard to Defendant's other arguments.

**B.      Federal Rule of Criminal Procedure 33**

Federal Rule of Criminal Procedure 33 provides that "[u]pon the

defendant's motion, the court may vacate any judgment and grant a new trial if the

interest of justice so requires."  The burden of justifying a new trial rests with the

defendant, *see United States v. Endicott*, 869 F.2d 452, 454 (9th Cir. 1989), and a

"motion for new trial is directed to the discretion of the judge."  *United States v.*

*Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981); *accord United States v. Mack*, 362

F.3d 597, 600 (9th Cir. 2004) (reviewing the denial of a motion for new trial under

Rule 33(a) under an abuse of discretion standard).  "A district court's power to

grant a motion for a new trial is much broader than its power to grant a motion for

judgment of acquittal, *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir.

1992), as a "new trial may be granted by the district court when the 'interest of

justice so requires.'"  *United States v. Moses*, 496 F.3d 984, 987 (9th Cir. 2007)

(quoting Fed. R. Crim. P. 33(a)).

## III. <u>DISCUSSION</u>

**A.    Public Trial**

Defendant argues that his right to a public trial was violated when his family members were unable to attend a portion of jury selection and when tape recordings were played through headphones for the jury, counsel and judge, but were not audible to the spectators.  The court rejects both these arguments.

### 1.    *Family Members' Absence During a Portion of Jury Selection*

At the beginning of jury selection and without the court's knowledge, courtroom staff directed Defendant's family to leave the courtroom to allow adequate seating for the jury pool.  Doc. No. 568, Seitz Decl. ¶ 19.  Defendant's counsel inquired regarding extra seats and was told that they could return to the courtroom once enough jurors were excused.  *Id.* ¶ 20.  Defendant's counsel never objected or otherwise raised this issue with the court, and also failed to ask Defendant's family to come back to the courtroom when seats were available.  In total, Defendant's family was not present for 1-½ to 2 hours of jury selection.

Defendant argues that his family's absence for a portion of jury selection violates his Sixth Amendment right to a public trial.  The Sixth Amendment guarantees criminal defendants the right to a trial that is open to members of the public.  This right extends "not only to the trial as such but also to

the voir dire proceeding in which the jury is selected." *Waller v. Georgia*, 467

U.S. 39, 44 (1984) (citing *Press-Enterprise Co. v. Super. Ct. of Cal.*, 464 U.S. 501

(1984)).  "Closed proceedings, although not absolutely precluded, must be rare and

only for cause shown that outweighs the value of openness." *Press-Enterprise Co.*,

464 U.S. at 509.  "The presumption of openness may be overcome only by an

overriding interest based on findings that closure is essential to preserve higher

values and is narrowly tailored to serve that interest." *Id.* at 510.  In closing a

courtroom, the court should articulate findings with "requisite specificity" and

"consider alternatives to closure." *Id.* at 513.

   Implicit in this framework is that the court actually close the

courtroom -- "'[t]he denial of a defendant's Sixth Amendment right to a public trial

requires some affirmative act by the trial court meant to exclude persons from the

courtroom.'" *United States v. Shryock*, 342 F.3d 948, 974 (9th Cir. 2003) (quoting

*United States v. Al Smadi*, 15 F.3d 153, 155 (10th Cir. 1994)).  Thus, "a

defendant's right to a public trial is only implicated by a 'closure.'" *Id.*  A closure,

however, does not occur due to mere lack of adequate seating:

> [T]he public trial guarantee is not violated if an individual
> member of the public cannot gain admittance to a courtroom
> because there are no available seats. . . .  A public trial implies
> only that the court must be open to those who wish to come, sit
> in the available seats, conduct themselves with decorum, and
> observe the trial process.

*Id.* (quoting *Estes v. Texas*, 381 U.S. 532, 588-89 (1965) (Harlan, concurring)); *see also United States v. Kobli*, 172 F.2d 919, 923 (3d Cir. 1949) (stating that the constitutional right to a public trial does not require holding trial in a place large enough to accommodate all those who desire to attend).

The court never barred individuals from Defendant's trial and was not even aware that Defendant's family had been asked to make room for the jury pool. Accordingly, the lack of seating for those interested in viewing the jury selection, including Defendant's family, did not act as a closure of Defendant's trial.

Further, even if these facts could somehow give rise to a "closure," this closure did not amount to a violation of Defendant's Sixth Amendment rights. Importantly, Defendant failed to timely object and therefore waived this right. *See Levine v. United States*, 362 U.S. 610, 619 (1960) (stating that failure to object to closing of courtroom waived right to public trial); *United States v. Hitt*, 473 F.3d 146, 155 (5th Cir. 2006) ("Where a defendant, with knowledge of the closure of the courtroom, fails to object, that defendant waives his right to a public trial."); *Lacaze v. United States*, 391 F.2d 516, 520-21 (5th Cir. 1968) (holding that the court's order that the courtroom be locked during one session of the trial was not reversible error when the defendant did not object to the closure); *see also Singer v. United States*, 380 U.S. 24, 35 (1965) ("[A]lthough a defendant can, under some

7

circumstances, waive his constitutional right to a public trial, he has no absolute

right to compel a private trial.").

       For these reasons, the court finds that Defendant's family's absence

from a portion of jury selection did not violate Defendant's Sixth Amendment right

to a public trial.

## 2.   *Failure to Make Tape Recordings Played to Jury Audible to the Audience*

       Defendant argues that his right to a public trial was violated when, for

a portion of the trial, evidence in the form of tape recordings was played through

headphones available to the judge, jury, and counsel, but not to the audience.  The

court rejects this argument for several reasons.

       First, as a matter of law, the failure to play tape recordings to the

entire courtroom does not violate the right to a public trial.  *Iva Ikuko Toguri*

*D'Aquino v. United States*, 192 F.2d 338 (9th Cir. 1951), addressed this same issue

when the defendant objected that the playing of recordings through earphones

available to only the judge, jury, clerk, court reporter, defendant, counsel and

members of the press denied her a public trial.  *Iva Ikuko Toguri D'Aquino*, 192

F.2d at 365.  *Iva Ikuko Toguri D'Aquino* found the defendant's argument "wholly

without merit," because a defendant could then just as easily argue that he was

denied a public trial where exhibits are examined by the jury but not passed around

to spectators. *Id.* (citing *Gillars v. United States*, 182 F.2d 962, 977-78 (D.C. Cir. 1950)).

Second, even if the failure to play the tapes could potentially raise a Sixth Amendment violation, the facts of this action do not establish a violation. Defendant asserts that the court offered no acceptable remedy when Defendant raised this issue during trial because the court offered only to replay the tapes in front of the jury, which would give "undue emphasis to that portion of the government's case." Doc. No. 568, Seitz Decl. ¶ 25. Contrary to Defendant's recitation of the facts, the court offered a number of remedies, all of which Defendant's counsel declined. Specifically, the court inquired whether Defendant's counsel wanted the court to take any corrective action, including playing the tapes in open court *without* the jury present. Defendant's counsel declined, stating that he did not "believe anything is required. It was just a concern I had. It never occurred to me that that was a problem until I raised it with you. So I think it's been handled adequately." Doc. No. 592, Trial Tr. 6-13. In sum, the court gave Defendant options to correct any perceived concern that the tapes were not originally played for the entire courtroom and Defendant both refused these offers and never made a formal objection. Accordingly, the court rejects that

Defendant's Sixth Amendment right to a public trial was violated when tape

recordings were not made audible to the entire courtroom.

## B.   Family Visitation

Defendant argues that the court should grant a new trial or dismiss the

charges against him because his rights to family visits were limited during his

pretrial detention due to unnecessarily broad conditions placed on Defendant to

keep him separated from co-defendants.[2]  Def.'s Mot. 3.  Specifically, Defendant

had been housed in the Special Housing Unit ("SHU") of the Honolulu Federal

Detention Center (the "FDC") on a rotational basis as a means to separate him

from his co-defendants.  Doc. No. 443.  The FDC separated each of the defendants

in this action upon request by the U.S. Attorney's Office due to the nature of the

charges against the defendants, the possibility of collusion, and the fact that one

co-defendant, Hector Cruz, expressed to the government that he felt pressure to not

plead guilty and indeed decided not to enter a plea of guilty on the day his change

of plea hearing was scheduled and after Defendant's attorney visited him.[3]  Due to

---

[2]  The Declaration of Eric A. Seitz further asserts that Defendant and his family experienced on-going visitation problems during the trial, which limited his visits with his family.  *See* Doc. No. 568, Seitz Decl. ¶¶ 10-18.  To the extent the Seitz Declaration could be viewed as arguing that these limited visits entitle Defendant to a new trial, the court rejects such argument as meritless.

[3]  This attorney pre-dated Eric A. Seitz' representation of Defendant.

10

the limited space, the FDC utilized the SHU in rotating the defendants between different floors of the facility.

The court has already addressed and rejected this same argument in denying Defendant's June 6, 2008 Motion to Dismiss Indictment on July 8, 2008. As explained during the July 8, 2008 hearing, a court may dismiss an indictment under only two theories: (1) "'on the ground of outrageous government conduct if the conduct amounts to a due process violation[, or] (2) if the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers.'" *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008) (quoting *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991)).

Conditions of detainment that amount to punishment, as opposed to mere regulatory restraint, violate a pretrial detainee's constitutional rights. The Supreme Court explained this distinction as follows:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal -- if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Bell v. Wolfish*, 441 U.S. 520, 539 (1979).

11

In determining whether particular conditions of pretrial detainment amount to punishment, the Ninth Circuit applies a two-part test. First, the court must "examine whether the restriction is based upon an express intent to inflict punishment." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002). If there is no indication of an express intent, the court next considers "whether punitive intent can be inferred from the nature of the restriction[, which] turns upon 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether [the restriction] appears excessive in relation to the alternative purpose assigned [to it].'" *Id.* at 1045-46 (quoting *Bell*, 441 U.S. at 539). "Put more simply, 'if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id*. at 1046 (quoting *Bell*, 441 U.S. at 539).

Applying these principles, Defendant's placement in the SHU was not "punishment" violative of Defendant's constitutional rights because there is no evidence of any express intent to inflict punishment and it was reasonably related to legitimate government objectives. This case involved multiple co-defendants, with several that could have potentially testified against Defendant. Further, there was evidence that Cruz was pressured to change his guilty plea. Accordingly, the

government had an interest in keeping these individuals separated for both safety and to prevent collusion.  The FDC's means of separating the defendants -- by keeping each defendant on a separate floor and rotating individuals through the SHU -- was reasonably related to ensuring safety of prisoners and preventing collusion.  While less restrictive means may have been possible to separate all of the defendants, the reasonable relationship test does not require an "exact fit" or a showing that it is the "least restrictive alternative."  *Valdez*, 302 F.3d at 1046.

The court further finds that this case does not present facts requiring the court to dismiss the FSI under its supervisory powers.  The court may only dismiss an indictment where there is prosecutorial misconduct that is flagrant and causes substantial prejudice to the defendant.  *United States v. Fernandez*, 388 F.3d 1199, 1239 (9th Cir. 2004).  No such facts are present here.  Accordingly, Defendant's limited family visits are not a basis of relief for Defendant.

### C.   Objections During Closing Argument

Defendant argues that objections by both the government and the judge "constituted unwarranted interference with the presentation of a defense and may adversely have affected the jury's view of the case in a manner that was prejudicial to the Defendant."  Def.'s Mot. 4.

A defendant's "closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt," *Herring v. New York*, 422 U.S. 853, 862 (1975), and Defendant's counsel is permitted to argue all reasonable inferences from the evidence.  *United States v. Miguel*, 338 F.3d 995, 1001-02 (9th Cir. 2003).  With that said, however:

> [t]he presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations.  He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant.  He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial.  In all these respects he must have broad discretion.

*Herring*, 422 U.S. at 862.

To warrant relief, misconduct during a closing argument must "'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)); *see United States v. Lahey*, 55 F.3d 1289,

14

1299 (7th Cir. 1995) (applying standard to determine whether objections during a defendant's closing argument provided basis to challenge conviction).  To prevail on such a claim, Defendant must show a "reasonable likelihood" that the jury based its verdict on such misconduct.  *See Brown v. Payton*, 544 U.S. 133, 143-44 (2005) (internal citation omitted); *Boyde v. California*, 494 U.S. 370, 380-81 & n.4 (1990).

The court did not limit Defendant's time in presenting his closing argument.  Rather, Defendant was limited only by the fundamental rule that he base his arguments on the evidence presented.  The government made objections where Defendant arguably went beyond the evidence presented and the court overruled or sustained them as appropriate.  Defendant points to no particular objections that the court improperly sustained and from its own review, the court finds that the objections did not improperly limit Defendant in presenting his closing argument and do not support *any* inference that they affected the jury's decision.  Accordingly, the court rejects that Defendant is entitled to a new trial due to the objections during Defendant's closing argument.

### D.     Sufficiency of the Evidence

Defendant seeks acquittal on Counts 1 and 7 on the basis that the "quality" and nature of the evidence was ambiguous at best and never directly implicated Defendant in drug transactions.  Def.'s Mot. 4.  The court rejects this argument.

As outlined in its April 2, 2009 Order, the government presented significant evidence implicating Defendant on both these Counts.  In support of Count 1, conspiracy to possess with intent to distribute and to distribute 500 grams or more of methamphetamine, Edward Tufele ("Tufele") testified that he met with Defendant in 2005 so that Tufele could transport methamphetamine from Las Vegas to Hawaii by canning the methamphetamine in metal cans.  Doc. No. 588, Trial Tr. 2-17-24.  Tufele testified that he subsequently canned methamphetamine on two separate occasions and placed the canning machine in storage in Las Vegas before his December 2005 arrest.  *Id.* at 2-124-31; *see also* Pl.'s Exs. 2 (rental agreement for storage unit), 21 (flight information for Tufele).

Nathan Oandasan ("Oandasan"), Zaneta Nixon ("Nixon") and Regina Costales ("Costales") provided further details of the operation on Oahu.  Oandasan testified that he received methamphetamine from Las Vegas, dropped it off to dealers in Hawaii, collected the money, and sent the money to Las Vegas.  *See*

16

Doc. No. 588, Trial Tr. 2-187-88.  Oandasan further testified that he reported to

John Ayala and Hector Cruz ("Cruz"), and was told that Defendant was the "boss."

*Id.* at 2-191.  Oandasan and Nixon both testified about receiving methamphetamine

through the mail which was packaged in metal cans, *id.* at 2-187-88; Doc. No. 589,

Trial Tr. 3-147; and Oandasan, Nixon, and Costales all testified regarding their

travels to Las Vegas to transport proceeds from the drug sales to Defendant in Las

Vegas.  They explained that Defendant personally met each of them at the airport

and collected the money.  Doc. No. 588, Trial Tr. 2-194 -200; Doc. No. 589, Trial

Tr. 3-63-69, 3-151-52; Pl.'s Exs. 23 (flight information for Oandasan, Costales and

Nixon), 25 (hotel information Oandasan, Costales and Nixon).

        The government also presented testimony that Defendant (1) checked

on the status of the Oahu portion of the drug operation by calling Oandasan and

Costales, Doc. No. 588, Trial Tr. 2-192, Doc. No. 589, Trial Tr. 3-82; (2) came to

Oahu in September 2006 for less than 24 hours purportedly to collect money from

Oandasan, Doc. No. 588, Trial Tr. 2-201-02; Pl.'s Ex. 23 at 81, 83 (flight

information for Defendant); (3) was aware he was under surveillance, Doc. No.

589, Trial Tr. 3-162-63; Doc. No. 590, Trial Tr. 4-55; Pl.'s  Ex. 61; and (4) spoke

to a paid informant, who testified that Defendant was interested in a possible deal

to transport drugs to Atlanta.  Doc. No. 589, Trial Tr. 3-206-09.  Nixon further

testified that she visited Defendant in Las Vegas in November 2006 and told him

that she was short on paying for the methamphetamine she had already received.

Defendant assured her that she would still receive methamphetamine to sell, and

Nixon received additional methamphetamine shortly thereafter.  Doc. No. 589,

Trial Tr. 3-151-52.

In further support of Count 1 as well as specifically in support of

Count 7, distribution of 50 grams or more of methamphetamine on or about March

23, 2007, the government presented significant evidence tying Defendant to this

transaction.  Officer Keane Tabanera ("Tabanera") testified that Kaowili

introduced him to Cruz as Kaowili's cousin so that Tabanera could purchase one

pound of methamphetamine.  Tabanera testified that he met Cruz on March 14,

2007, but because the "chickens" (as Cruz referred to it), had not arrived yet, they

had to meet again on another day.  Doc. No. 590, Trial Tr. 4-148-49.

Kaowili then had a series of conversations with Cruz and Defendant

during the evening hours of March 19, 2007.  In the first conversation, Cruz tells

Kaowili to speak with "Uncle," Defendant's nickname:

> Cruz:  (unintelligible) . . . alright-alright, here we go, OK,
> you know what, um, I would like you talk to uncle
> you know that way (unintelligible) we clear, make
> it clear, that shit, you know what I mean?  And
> then um, especially, explain him everything, you
> know, explain him what's up and everything, you

know, that's all I want and after-after-after he pau
talk to you, he going to call me back, then I call
you back, oh (unintelligibly) to you, OK?

Kaowili:      OK.

Ex. 69.

That day, Kaowili then spoke with Defendant about introducing his

"cousin" (Tabanera) and Defendant confirmed that they would "fight chickens" on

Wednesday:

Defendant:    . . . . so do you want to still fight roosters?
Kaowili:      Yeah, yeah.  (unintelligible) I told them the plan,
              and I told him you know now now, I spoke to you
              cousin down here about how we going to fight
              chicken and he kinda agrees with it, I going to
              purchase one, I going to introduce, introduce him
              to my cousin, and from there, we going to work
              things out from there, instead of me, you know,
              you know what I mean?
Defendant:    Yeah?
. . .
Kaowili:      I got to build, because I, I, I like be, I going to be
              involved, but I going to be out of sight, I going to
              overlook the situation, you know what I mean?
Defendant:    Um hum.
. . .
Defendant:    Go, go and talk, yeah go and talk to him, and you
              guys define the plan how you going to fight the
              chickens, and then he's going to let me know, you
              know, and um, I, I'm here, I take care of them
              here, I doing my part here, you know like now we
              going to be straight um, you know any problem
              understand, you call me this phone, right now here,
              that you have right now, call me up, it's going to
              be um, only in like night time.

19

| | |
|---|---|
| Kaowili: | Oh, night time, this number? |
| Defendant: | Yeah, like night time I either call you, you know, after, after six seven from here you can call me, because I want to keep it off in the daytime, and you know. |
| Kaowili: | OK, OK, I talk to him, I don't know (unintelligible) um are we still fighting the um chickens on Wednesday, or the derby got delayed? |
| Defendant: | Wednesday is (unintelligible) yeah, yeah, should be (unintelligible) or like, I believe it going to be Wednesday.  Talk to him tomorrow, you guys can talk to that cousin, and I can, I going to go talk to him, and then from, from that you guys can just, you know, decide what you guys going to do there. |

Pl.'s Ex. 70.

After Kaowili spoke with Defendant, on the same day, Cruz called

Kaowili and left the following message confirming that they would "buy some

chickens" on Wednesday:

| | |
|---|---|
| Cruz: | Hey bro, I think that everything is-is alright now, I mean um, I mean you talked to him already so it's going to be cool, so um, I give you a call Wednesday to see what's up, OK?  Let see if we go buy some chickens or something. . . . |

Ex. 71.

On Wednesday, March 21, 2007, Cruz and Kaowili met, just as

Defendant and Cruz had confirmed in their previous conversations with Kaowili.

Cruz, however, had to delay the "fight" due to "trouble" in Mexico and therefore

rescheduled for Friday at the Zippy's restaurant in Wahiawa, Oahu:

20

| Cruz: | Um.  We being here lately, we have a little trouble because you know, that they fucked up in Mexico.  You know, the government.  Uh. |
|---|---|
| Kaowili: | Uh. |
| Cruz: | (unintelligible) like I said.  But uh, the deal right now is that the thing is on the way now. |
| Kaowili: | No kidding.  Okay. |
| Cruz: | It's on the . . . it's on the way of for you now.  Okay so, I just going call you.  Uncle told me, he will talk . . . calling you . . . |
| . . . | |
| Kaowili: | So where we going fight, though?  When we going fight with Larry? |
| Cruz: | Saturday.  Uh Friday.  Friday for sure. |
| Kaowili: | For sure. |
| Cruz: | But the other hundred percent, for sure Friday. |
| Kaowili: | No meet someplace else or you know too much time. |
| Cruz: | Okay.  Okay, I know.  So what we gonna do. |
| Kaowili: | So I going call you, and I . . . |
| Cruz: | Let's meet at Zippy's Wahiawa. |

Pl.'s Ex. 72.

That these conversations spanning from March 19, 2007 through March 21, 2007 were about purchasing methamphetamine as opposed to "fighting chickens" is confirmed by the fact that Tabanera met Cruz on March 23, 2007 at the Zippy's restaurant in Wahiawa and received one pound of methamphetamine. Doc. No. 590, Trial Tr. 4-151-154; Pl.'s Ex. 43, 44A, 74.  Nixon confirmed that this methamphetamine came from Defendant.  She explained that Cruz had received two pounds of methamphetamine for distribution and Nixon wanted both

pounds, but Cruz told her that "Uncle" told him to sell the one pound to Kaowili.
Doc. No. 589, Trial Tr. 3-156-57.

Viewing this evidence in the light most favorable to the government, the court finds that a rational jury could have found Defendant guilty of each element of each Count beyond a reasonable doubt. While the court recognizes that several of the witnesses that the government presented were cooperators and impeached to a certain degree, the testimony was not so incredible to warrant judgment of acquittal. The court therefore will not invade the jury's function of determining witness credibility, especially in this case where each Count was supported by multiple witnesses and substantial evidence. *See United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002) ("[I]t is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." (quotation signals omitted)). In sum, the court DENIES Defendant's Rule 29 request for acquittal.

## IV.  <u>CONCLUSION</u>

Based on the above, the court DENIES Defendant's Motion for Entry of Judgment of Acquittal, New Trial, or Other Appropriate Relief.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, April 3, 2009.



_/s/ J. Michael Seabright_____
J. Michael Seabright
United States District Judge

*United States v. Gaitan-Ayala*, Cr. No. 07-00268-01 JMS, Order Denying Defendant Nelson Gaitan-Ayala's Motion for Entry of Judgment of Acquittal, New Trial, or Other Appropriate Relief